## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| THE DELOACH GROUP, INC. d/b/a, Quastar Computer International | |
| Plaintiff, | CASE NO. 1:11-CV-1678-JOF |
| vs. | |
| ASHFORD FINANCE LLC, NOUSHIR HASAN, CARREFOUR INFORMATIQUE TREMBLANT, INC, CORPORATE FUNDING PARTNERS, LLC D/B/A GANGES EXPORTS USA, LC.COM, LTD., MARSHALL JABLON, MIKE TONES, AMIN HAQ, AND BEEM KHEMANEY | |
| Defendants. | |

### SECOND AMENDED COMPLAINT

COMES NOW THE DELOACH GROUP, INC d/b/a Quastar Computer International (hereinafter referred to as "Quastar"), and pursuant to F.R.C.P. 15(a)(2)and files this Amended Complaint and a Motion for Leave of Court to File the Second Amended Complaint, showing the Court as follows:

1.

Defendant Ashford Finance Company LLC ("Ashford Finance") is a Delaware company with its principal place of business in New York, New York and may be personally served with process through its registered agent Noushir Hasan at 50 Broadway 33rd floor, New York, New York 10004.

2.

Defendant Nourshir Hasan ("Hasan") is a resident of the State of New York and may be served at 530 E 9th St., New York New York, 10128. Mr. Hasan is, upon information and belief, a senior level employee of Ashford Finance.

3.

Defendant Corporate Funding Partners, LLC d/b/a Ganges Exports USA ("Corporate Funding") is a New York company that does or had its principal place of business at 250 West 57th Street, Suite 1414, New York, New York, 10023. Upon information and believe, Ganges Exports USA was an "export agent" for Corporate Funding, a fictional entity that was a name used by Corporate Funding in various transactions.

4.

Defendant Carrefour Informatique Tremblant, Inc. ("Carrerfour") is purported to be or was a Quebec company that had its principal place of business at 460 Montee Kavanagh, Mont Tremblant, Quebec J8E2P2 and can also be served through its Secretary, Mr. Prom Sokhonna, at 11-11825 rue Ranger Montreal (Quebec) H4J2K7 Canada.

5.

Defendant Mike Tones ("Tones") purportedly is or was an employee of Corporate Funding Partners, LLC and Carrefour, and to have corporate authority and responsibility with both companies, and is believed to be a resident of Quebec Canada.

6.

Defendant Amin Haq ("Haq") purportedly is or was an employee of the fictional entity Ganges Exports USA and is believed to be a resident of New York.

7.

Defendant Beem Khemaney ("Khemaney") purportedly is or was an employee of the fictional entity Ganges Exports USA and is believed to be a resident of Hong Kong.

8.

Defendant LC.Com, Ltd,("LC.Com") is a Delaware company owned and controlled by Defendant Marshall Jablon that has its principal place of business at 250 West 57th Street, Suite 1414, New York, New York, 10023.

9.

Defendant Marshall Jablon solely owns and controls Corporate Funding, LC.Com, Ltd. and other companies and is a resident of New York and can be served at his personal residence at 400 Mamaroneck Avenue, Harrison, New York.

10.

Plaintiff Quastar is a Georgia company with it principal place of business at 5910 Shiloh Road East, Ste. 101 Alpharetta, Georgia 30005 in Forsyth County and is in the business of selling computer equipment.

11.

This Court has jurisdiction over this matter, as well as over the Defendants pursuant to O.C.G.A § 9-10-91, *and*, venue is proper herein, more specifically as to each Defendant:

a) Ashford Finance, LLC- Through the fraudulent misrepresentations made by its agent, Mr. Nosh Hasan, concerning the nature of the shipping compliance certificate through direct communications with Quastar while Quastar was in Georgia while knowing Quastar was in Georgia and directly through its refusal to deliver the Shipping Compliance Certificate in Georgia  as detailed in paragraphs 18, 27 and 35-41 of this Second Amended Complaint, Ashford has transacted business within Georgia under O.C.G.A. § 9-10-91 (1), and also by committing a tortious act within Georgia under O.C.G.A. § 9-10-91(2) and under the principles set forth by the Georgia Supreme Court in Innovative Clinical & Consulting Serv., LLC v. First Nat'l Bank, 279 Ga. 672, 620 S.E.2d 352 (2005);

b) Nosh Hasan- by making the fraudulent misrepresentations with Quastar while Quastar was in Georgia while knowing Quastar was in Georgia and refusing to deliver the Shipping Compliance Certificate in Georgia  as detailed in paragraphs 18, 27 and 35-41 of this Second Amended Complaint, Hasan has transacted business within Georgia under O.C.G.A. § 9-10-91 (1), and also by committing a tortious act within Georgia under O.C.G.A. § 9-10-91(2) and under the principles set forth by the Georgia Supreme Court in Innovative Clinical & Consulting Serv., LLC v. First Nat'l Bank, 279 Ga. 672, 620 S.E.2d 352 (2005).

c) Corporate Funding Partners, LLC d/b/a Ganges Exports USA- by acting as both the consignee of the truck bills of lading and as the applicant of the letter of credit and therefore the receiver of the goods obtained by fraudulent pretenses as detailed in paragraphs 17, 20, 22, 24 and 28 of this Second Amended Complaint, Corporate Funding has transacted business within Georgia under O.C.G.A. § 9-10-91 (1), and also by committing a tortious act within Georgia under O.C.G.A. § 9-10-91(2) and under the principles set forth by the Georgia Supreme Court in Innovative Clinical & Consulting Serv., LLC v. First Nat'l Bank, 279 Ga. 672, 620 S.E.2d 352 (2005).

d) LC.Com, Ltd- as being the entity that Defendant Jablon acknowledges is the entity that was involved in the procurement

of letter of credit transactions that were involved in the
fraudulent scheme as outlined in Paragraphs 42-47 of the Second
Amended Complaint and as has been used by its sole owner,
Defendant Jablon, LC.Com, Ltd as a tradename for Corporate
Funding, LC.Com has transacted business within Georgia under
O.C.G.A. § 9-10-91 (1), and also by committing a tortious act
within Georgia under O.C.G.A. § 9-10-91(2) and under the
principles set forth by the Georgia Supreme Court in <u>Innovative</u>
<u>Clinical & Consulting Serv., LLC v. First Nat'l Bank</u>, 279 Ga.
672, 620 S.E.2d 352 (2005).

d) Marshall Jablon- by using Corporate Funding, LC.Com and
Ganges Exports USA as shell entities, or in the case of Gagnes,
a non-existent company, having little or no assets, disregarding
corporate formalities and inserting these corporate entities
interchangeably into the Quastar transaction and to other letter
of credit transactions associated with the fraudulent scheme to
steal computer equipment from Georgia and from other computer
equipment wholesalers in the United States and have the
equipment shipped outside the United States as a consignee to
the truck bills of lading and controlling the shipment of the
stolen goods as detailed in this Second Amended Complaint,
Marshall Jablon has transacted business within Georgia under
O.C.G.A. § 9-10-91 (1), and also by committing a tortious act

within Georgia under O.C.G.A. § 9-10-91(2) and under the

principles set forth by the Georgia Supreme Court in <u>Innovative</u>

<u>Clinical & Consulting Serv., LLC v. First Nat'l Bank</u>, 279 Ga.

672, 620 S.E.2d 352 (2005).

e) Mike Tones, Amin Haq and Beem Khemaney- to the extent

such individuals with those names exist, each individual made

misrepresentations and defrauded Plaintiff Quastar through

misrepresentations concerning the nature of the shipping

compliance certificate and the legitimacy of the transaction and

the letter of credit as detailed in this Complaint as such, each

individual has transacted business within Georgia under O.C.G.A.

§ 9-10-91 (1), and also by committing a tortious act within

Georgia under O.C.G.A. § 9-10-91(2) and under the principles set

forth by the Georgia Supreme Court in <u>Innovative Clinical &</u>

<u>Consulting Serv., LLC v. First Nat'l Bank</u>, 279 Ga. 672, 620

S.E.2d 352 (2005).

12.

In or around February 2009, Defendants Carrefour and Tones

approached Quastar to purchase various computer equipment from

Quastar (the "First Carrefour Approach"). On February 27, 2009,

Mr. Prom Sokhonna completed a Quastar Computer Account

Application on behalf of Carrefour.  Upon information and

belief, Mr. Sokhonna is or has been an employee and agent of both Corporate Funding and Ashford Finance.

13.

After completion of a credit application and a review by Quastar, Quastar communicated to Carrefour and Tones that Carrefour would have to pay in advance or provide a letter of credit for the requested computer equipment.

14.

Rather than paying in advance or providing a letter of credit, Carrefour and Tones did not purchase the equipment from Quastar in March of 2009.  Instead, Carrefour and Tones ceased contacting Quastar about the transaction for several months.

15.

In or around July 2009, Tones and Carrefour again approached Quastar about purchasing various computer equipment (the "Second Carrefour Approach"). At this time, Carrefour and Tones stated that they had secured a commitment for a letter of credit from First American Bank in Illinois for substantially the entire purchase price of the computer equipment.  At that time, Carrefour and Tones stated that they would procure the letter of credit with the assistance of its partners and related companies, Ashford Finance and Corporate Funding.

16.

On July 22, 2009, the CEO of Quastar, Mr. Jeff DeLoach in Georgia, received an email from Carrefour which attached a letter of credit application for a $336,636 letter of credit with First American Bank of Illinois. See draft letter of credit application attached as Exhibit "A". The applicant on the application was Carrefour listing its address at 460 Montee Kavanagh, Mont Tremblant, Quebec J8E2P2. The application also listed the documents necessary for the draw of the letter of credit.  In this listing of necessary documentation, it detailed that Corporate Funding and Ashford Finance were also parties in the transaction. The application indicated that the truck bills of lading were consigned to Corporate Funding and listed Corporate Funding's address **at the same address of Carrefour:** 460 Montee Kavanagh, Mont Tremblant, Quebec J8E2P2. Furthermore, the letter of credit application stated that the "Original Shipping Compliance Certificate signed and issued by an authorized officer of Ashford Finance" was a necessary document to draw on the letter of credit.

17.

On July 28, 2009, Mr. Jeff DeLoach in Georgia sought clarification on the precise role of Ashford Finance and Corporate Funding and sent Carrefour an email with the subject line "one more clarification question".  On the same date, July

28, 2009, Mr. Tones through his assistant Sophie, emailed Mr. DeLoach in Georgia with a response saying, "Dear Jeff: Corporate Funding Partners is Carrefour Informatique Tremblant Inc".  With regard to Ashford Finance, Mr. Tones stated through his assistant that "All Ashford does is authenticate the proof of deliverys (sic). . . all Ashford does is to make sure no false documentation is provided that goods were shipped when, in fact, no goods or inferior goods were shipped."  This statement by Mr. Tones/Carrefour/Corporate Funding concerning Ashford Finance's role was a fraudulent misrepresentation as, it is shown later in this Complaint, Ashford Finance now contends that verification of the shipment was not its sole role in the transaction. Ashford Finance now contends that the Shipping Compliance Certificate was at the complete discretion of Ashford Finance to give conditioned upon its satisfaction of Carrefour's "financing".

18.

On July 30, 2009, Mr. Jeff DeLoach sought to confirm what Carrefour had communicated to him with both Ashford Finance and Corporate Funding.  Mr. Hasan called Mr. DeLoach in Georgia on the same day, July 30, and confirmed that Ashford Finance's role was to verify shipment as Mr. Tones had communicated. With regard to the shipment, Mr. Hasan stated that the Shipping Compliance Certificate would be provided to Quastar in Georgia

once it was verified that the goods that were ordered were
indeed shipped. Mr. Hasan did not tell Mr. DeLoach that the
Shipping Compliance Certificate was also subject to Ashford
Finance's discretion about "financing" or any other condition.
This statement by Mr. Hasan/Ashford Finance concerning Ashford
Finance's role was a fraudulent misrepresentation as, it is
shown later in this Complaint, Ashford Finance now contends that
verification of the shipment was not its sole role in the
transaction.  Ashford Finance now contends that the Shipping
Compliance Certificate was at the complete discretion of Ashford
Finance to give conditioned upon its satisfaction of Carrefour's
"funding".

19.

Also, on July 30, 2009, Mr. Jeff DeLoach in Georgia called
First American Bank of Illinois to confirm Mr. Tones'
communication of July 28, 2009.  Mr. DeLoach spoke with Ms.
Patti Marshall, a banking officer, who confirmed that
Carrefour/Corporate Funding Partners had applied for a letter of
credit wherein Ashford Finance would verify the shipment and
provide the Shipping Compliance Certificate.

20.

In addition, due to Mr. DeLoach's inquiry on July 22, 2009,
Carrefour arranged for Mr. Simon Assraf a/k/a Simon Asseraf
a/k/a Simone Asseraf, of Corporate Funding, to contact Mr.

DeLoach to confirm the parties and their roles. On July 31, 2009, Mr. Assraf called Mr. DeLoach in Georgia in order to confirm Corporate Funding's role in the transaction.  Mr. Assraf confirmed that Corporate Funding was Carrefour. Since Mr. DeLoach believed he was speaking with the purchasing entity, Mr. DeLoach discussed altering the business details of the transaction with Mr. Assraf.  Mr. DeLoach told Mr. Assraf he wanted to separate the purchase into four or five smaller purchases and deliveries, instead of one large order for over $330,000, in order to mitigate Quastar's risk. Apparently sensing Mr. DeLoach's reluctance, Mr. Assraf then suggested that the transaction could be separated into 3 different deliveries and letters of credit; however, Mr. Asseraf requested that the initial delivery would be the largest delivery. Mr. Assraf then confirmed that Corporate Funding would be taking possession of the computer equipment once delivered to the Quebec address. Since Carrefour and Corporate Funding were intending to prevent Quastar from drawing on the letter of credit and not paying for the computer equipment, Carrefour and Corporate Funding fraudulently negotiated a larger shipment at the beginning of the transaction knowing there would not be subsequent transactions with Quastar.

21.

On or around August 18, 2009, Mr. DeLoach received a second draft letter of application in the amount of $190,834, which reflected the aforementioned change in the transaction as negotiated with Corporate Funding and Mr. DeLoach on July 22, 2009 which detailed Corporate Funding as the consignee of the truck bills of lading for the shipment to Carrefour. See Draft Letter of Credit Attached as Exhibit "B".

22.

On September 9, 2009, and in accordance to the structure that Mr. Asseraf established, a letter of credit was issued by First American Bank in the amount of $190,834 listing Quastar as the beneficiary and Ganges as the applicant. The letter of credit had an expiry date of December 9, 2009. (hereinafter the "Letter of Credit"; see Letter of Credit attached as Exhibit "C"). This was the first time that Ganges was identified as a party in the transaction.

23.

On September 17, 2009, Mr. DeLoach in Georgia called Ms. Patti Marshall of First American Bank of Illinois to confirm the validity of the letter of credit. Ms. Marshall confirmed the letter of credit and all of the parties involved. Mr. DeLoach also asked Ms. Marshall to confirm with Ashford Finance the terms of the letter of credit.  Mr. DeLoach in Georgia called

Ms. Marshall on September 18, 2009 to confirm whether she had spoken with Mr. Hasan about the letter of credit.  Ms. Marshall indicated that she had spoken to Mr. Hasan and that everything was "ok" on the letter of credit.

24.

On September 18, 2009, Mr. DeLoach in Georgia sought to confirm the role of Ganges Exports USA in the transaction and emailed Mr. Tones if he wanted to ship the computer equipment to that name. On the same date, Mr. Tones emailed to Mr. DeLoach in Georiga the the bill of lading should be addressed to Ganges Exports, USA c/o Carrefour at 460 Montee Kavanagh, Mont Tremblant, Quebec J8E2P2. Mr. Tones communicated that Ganges Exports USA ("Ganges") was merely the "export agent" for Ashford Finance in the transaction. This statement by Mr. Tones was false as Carrefour/Corporate Funding were fraudulently inserting a non-existent entity in an attempt to remove Corporate Funding's name in the transaction. Ganges was a non-existent entity and inserted in the transaction for the sole purpose of defrauding Quastar.  In addition, Ganges was purporting to act as the "export agent" for Corporate Funding.

25.

On or around September 23, 2009, Mr. DeLoach received a telephone call on his cell phone in Georgia from someone

identifying himself as "Ramesh" who was located in Singapore and
that he worked for Ashford. Ramesh advised Mr. DeLoach not to
ship the computer equipment as there were "funding issues."  On
the same day, Mr. DeLoach called Mike Tones and advised him he
would not ship the computer equipment based on his phone call
with Ramesh. In addition, Mr. DeLoach in Georgia called Mr. Nosh
Hasan of Ashford Finance to inquire about the validity of
Ramesh's telephone call. Mr. Hasan told Mr. DeLoach in Georgia
that there was no such person as "Ramesh" working for Ashford
Finance and that he was unaware of any problems with the letter
of credit and furthermore did not instruct Mr. DeLoach not to
ship the computer equipment.  Mr. Hasan's statements and
assurances to Mr. DeLoach are fraudulent under Ashford Finance's
own defense of Quastar's claim.  After Quastar shipped the
equipment, Ashford Finance now contends that it told Quastar not
to ship the equipment and should have heeded "Ramesh" despite
Mr. Hasan's contrary statements to Mr. DeLoach on September 23,
2009.

26.

Carrefour sent an email on September 23, 2009 to Mr.
DeLoach in Georgia pleading Quastar to ship the computer
equipment and stating, "Ashford would no way put their name on a
document if due diligence had not been done . . . [First
American Bank] would not issue an LC unless they had done their

due diligence . . . [Mr. DeLoach] what can be done to salvage the situation?" Mr. DeLoach informed Carrefour that he would not ship the computer equipment unless he could be assured that there were no problems with the letter of credit. In a subsequent telephone call that day, Carrefour promised to have Ashford and Ganges call him.

27.

Mr. DeLoach in Georgia, called and left messages for Mr. Nosh Hasan between October 15th through the 20th, and on October 20, 2009, Mr. Hasan called Mr. DeLoach in Georgia. Mr. Hasan told Mr. DeLoach that "everything was getting squared away" on the letter of credit and that he would have Carrefour contact Mr. DeLoach shortly. Mr. Hasan's assurance was fraudulent as Ashford Finance did not have any intention to send the Shipping Compliance Certificate and was going to prevent Quastar from drawing on the letter of credit.  Mr. Hasan's fraudulent assurance was solely meant to entice Quastar to ship the computer equipment that Ashford Finance knew would never be paid for.

28.

On October 26, 2009, Mike Tones through his assistant Sophie of Carrefour emailed Mr. DeLoach in Georgia to further assure Mr. DeLoach to ship by explaining Ganges Exports, "Ganges Exports USA who is guarantying the full payment by full to

Ashford Finance. Carrefour has guaranteed the payment to Ganges. That is why Ashford is comfortable with Ganges Exports USA as they have been doing business for quite some time." In addition, Carrefour introduced Mr. DeLoach to a Mr. Amin Haq, whom Carrefour represented as the head of Ganges. In another email to Mr. DeLoach in Georgia on October 27, 2009, Mike Tones through his assistant Sophie of Carrefour stated, "The relationship between Ashford and Ganges Exports USA is privy to me.  I have asked that someone contact you again to clear up this matter.  I do know that Ashford and Ganges Exports USA have been working together for quite some time. [First American Bank] would not issue a naked LC just on the advice of one company unless they had great experience with that company. But their relationships are privy between themselves.  I highly doubt a Bank would issue an LC if there was no prior experience with these companies . . . I have requested that someone call you immediately to clear up any issues." Carrefour/Corporate Funding's statements were fraudulent and meant to entice Quastar to ship the goods. Ganges was a non-existent entity that was being substituted in the transaction by Corporate Funding in an attempt to remove Corporate Funding's name from the transaction, in light of the disputes that Corporate Funding, Ashford Finance and Carrefour were having in Florida, Kentucky and California, which are detailed below in this Second Amended Complaint. In addition,

Carrefour/Corporate Funding's insertion of Ganges into the transaction was meant to fraudulently cause a discrepancy with the letter of credit so that the name on the invoice would not match with the name of the applicant on the letter of credit, and would later be cited by Ashford Finance as a reason not to provide the Shipping Compliance Certificate.

29.

On October 28, 2009, a man identifying himself as Amin Haq called Mr. DeLoach in Georgia. Mr. Haq identified himself as working with Ganges and that Ganges "worked with" Ashford.  Mr. Haq confirmed by telephone to Mr. DeLoach that all of the conditions of the letter of credit had been fulfilled.  Mr. Haq also reiterated this to Mr. DeLoach by email on that same date. On October 28, 2009,Mr. DeLoach also called Ms. Patti Marshall at First American Bank to confirm whether the letter of credit was still valid, and Mr. Marshall confirmed that the letter of credit was still in place and valid. Mr. Haq's representations to Mr. DeLoach and Quastar were fraudulent as Ashford Finance would later contend that all of the conditions of the letter of credit have not been fulfilled, namely, Ashford Finance's contention that it had discretion to provide the Shipping Compliance Certificate based on Carrefour's "funding". In addition, Carrefour/Corporate Funding fraudulently presented Mr. Haq to Quastar in order to entice Quastar to ship the computer

equipment.  As Ganges and Ashford Finance would later contend, there was no "Amin Haq" of Ganges.

30.

On October 31, 2009, based on the Letter of Credit and the fraudulent assurances of Carrefour, Tones, Ashford Finance, Hasan, Corporate Funding, Haq and Ganges, that are detailed in the paragraphs above, Quastar shipped, and the aforementioned Defendants caused to be shipped through their fraudulent misrepresentations, the computer equipment totaling $215,978 to Carrefour. (See invoice attached as Exhibit "D").

31.

After shipment of the computer equipment, Quastar supplied Ashford Finance and Ganges with a bill of lading and proof of delivery showing that the computer equipment had been indeed delivered to Carrefour. However, both Ashford Finance and Ganges failed to supply the Shipping Compliance Certificate despite receiving the requisite documentation.

32.

After shipment of the computer equipment, Mr. DeLoach made repeated attempts to contact Carrefour, Ganges, Ashford Finance, Corporate Funding, Mr. Hasan, Mr. Asseraf.  No one would return his telephone calls.

33.

After these repeated attempts, Mr. DeLoach received his first response from any of the parties through an email from a Beem Khemaney who purported to represent Ganges.  In an email to Mr. DeLoach in Georgia dated November 18, 2009, Mr. Khemaney stated, "after much investigation, it seems to me that there is certainly some misrepresentation made to you by a certain Amin Haq . . . We do not know who this person is- he is not an authorised person of Ganges, nor have we had any dealings with."

34.

In addition, Quastar made repeated attempts to contact Ashford Finance concerning the Shipping Compliance Certificate, including in writing. Ashford Finance refused to communicate with Mr. DeLoach.

35.

On December 11, 2009, First American Bank confirmed that Quastar had not supplied the Shipping Compliance Certificate and instructed Quastar to "contact Ashford Finance LLC directly to determine what conditions must be satisfied for issuance of the document". Furthermore, First American Bank identified that it refused to honor the Letter of Credit because, *inter alia*, the shipping compliance certificate was not presented and because Ganges was the applicant of the Letter of Credit rather than Carrefour. The other discrepancies listed by First American Bank

were discrepancies that were either minor and administrative or incapable of resolution due to the fraudulent actions of the Defendants.

36.

Finally, on December 14, 2009, five days after the expiration of the Letter of Credit, counsel for Ashford Finance and Defendant Hasan communicated to Quastar that Quastar should not have shipped the goods because "Ashford Finance instructed Quastar not to ship the goods since there were questions about the transaction."  Furthermore, Ashford Finance believed that "illegal and fraudulent actions may have occurred". In addition, Ashford Finance's counsel in the aforementioned letter indicated that the Shipping Compliance Certificate was in its discretion to grant and Ashford did not give its discretion because Ashford Finance had "questions about the transaction". In this letter, Counsel for Ashford Finance also, for the first time and after the repeated assurances from Mr. Hasan about Carrefour and its role in the transaction, that "Quastar's invoice was sent to Carrefour, not Ganges.  This indicates that Quastar expected payment directly from Carrefour."

37.

In fact, Ashford Finance never instructed Quastar to not ship the computer equipment to Carrefour, except for the alleged

"Ramesh" who was purported to be an employee of Ashford Finance
and whom was specifically denied and contradicted by Mr. Hasan.

                              38.

    Ashford Finance's contention regarding the purposes and
terms of the Shipping Compliance Certificate also demonstrate
fraudulent misrepresentations as prior to the shipment of the
computer equipment, Ashford Finance represented that the supply
of the certificate was merely meant to satisfy verification of
the shipment.  After Quastar shipped the goods, Ashford Finance
now contends that it was within its discretion to send Quastar
the Shipping Compliance Certificate and that it could withhold
the certificate if it had "questions about the transaction."
This material condition was never disclosed to Quastar until
after Quastar had shipped, and all of Ashford Finance's
statements before the equipment was shipped were directly
contrary to this condition.

                              39.

    At no time before Quastar shipped the computer equipment to
Carrefour did defendants Ashford Finance, Ganges, Carrefour,
Tones, Hasan or Haq indicate that the Shipping Compliance
Certificate was a financing condition under the complete
discretion of Ashford Finance. Indeed, Quastar would have never
shipped the computer equipment to Carrefour if the Defendants
had communicated to Quastar that the Letter of Credit was

                             - 22 -

conditioned upon the complete discretion of Ashford Finance to produce a shipping compliance certificate that was based on whether Ashford Finance had "concerns" over the transaction.

                                        40.

     Ashford Finance and Ganges continued to refuse to provide the Shipping Compliance Certificate even though they had conclusive evidence of the shipment to Carrefour and thus fraudulently causing the expiration of the Letter of Credit on December 9, 2010 without payment to Quastar. Quastar has not been paid for the computer equipment nor has any computer equipment been returned to Quastar.

                                        41.

     After Quastar shipped the goods to Canada, Quastar became aware of the Defendants' fraudulent "additional document required" scheme that was perpetrated upon several victims over a several month period in 2009, all involving virtually the same identical parties, the same computer goods and the same fraudulent misrepresentation. An "additional document required" scheme is a maneuver by which an applicant, financier and/or broker, such as Ashford Finance and Corporate Funding, retains control over the seller of the goods' ability to draw on the purportedly 'irrevocable' letter of credit. An "additional document requirement" defeats the very purpose of a letter of credit by requiring a final document from the applicant or

financier/broker, rather than the seller, to be provided to the bank prior to the release of the letter of credit. As such a seller can fully comply with letter of credit obligations and nevertheless not be paid, if the applicant or financier/broker chooses not to provide the final required document-rendering the letter of credit utterly worthless. The parties who fell victim to this scam perpetrated by the Defendants:

42.

*Dependable Component Supply, Inc.("Dependable"); Date of Letter of Credit: May 22, 2009; Date of Shipment: June 2009.* The first apparent fraudulent transaction in the scam and virtually has all of the same players and patterns to the subsequent cases: Carrefour made a cold call on Dependable, a computer equipment wholesaler located in Florida, wanting to purchase hundreds of thousands of dollars of computer equipment to ship outside the country to Canada. Carrefour offered up a letter of credit listing Corporate Funding as the consignee to the bills of lading and Ashford Financeas controlling the shipping compliance certificate. The letter of credit had a shipping compliance certificate condition that Dependable understood from Ashford was to be provided upon proof of shipment of the goods to Canada. Because of the letter of credit and these assurances, Dependable shipped $532,584 of computer equipment to Carrefour's Quebec, Canada address listing

Corporate Funding as the consignee of the shipment.  Despite all of this, Dependable was completely scammed when Ashford Finance refused to provide the shipping compliance certificate and its goods were never returned.

43.

*Pyramid Technology Enterprises, Inc. ("Pyramid"); Date of Letter of Credit: July 3, 2009; Date of Shipment: July 15-August 12, 2009.* The next victim in the scheme was Pyramid located in Irvine, California. As in the Dependable case, Carrefour made a cold call seeking to buy a large shipment of computer equipment to be shipped to Canada. Likewise, Carrefour offered a letter of credit issued by First American Bank, with Corporate Funding as the consignee and Ashford Finance as the provider of the shipping compliance certificate. The letter of credit had the same shipping compliance certificate requirement that was in the Dependable letter of credit. Pyramid understood that the shipping compliance certificate would be provided by Ashford Finance when Pyramid provided proof of shipment. After Pyramid shipped $676,725 of computer equipment to Corporate Funding's consignee address in Quebec, Ashford Finance refused to provide the shipping compliance certificate, thereby defrauding and using deception to steal Pyramid's goods.

44.

*Fusion Trade, Inc.;* ("Fusion")*Date of Letter of Credit:*
*August 3, 2009; Date of Shipment: Did not ship.* The next victim
lined up in this scheme was Fusion located in Andover,
Massachusetts. Identical to Dependable and Pyramid, the
transaction involved a large shipment of computer equipment,
totaling $340,100, to Canada with Corporate Funding Partners as
the consignee of the truck bills of lading and Ashford Finance
as providing the shipping compliance certificate. However, in
early to mid-August 2009, Fusion told Corporate Funding, Ashford
Finance and Carrefour that it was not going through with the
sale, because Fusion's bank, TD Banknote, advised Fusion not to
proceed.

45.

*Pomeroy IT Solutions, Inc. (hereinafter "Pomeroy")* *Date of*
*Letter of Credit: September 4, 2009; Date of Shipment: September*
*21, 2009.* Again, Carrefour makes a cold call on this computer
wholesaler based in Hebron, Kentucky in March 2009 to purchase
$365,715 of various computer equipment to be shipped to Canada.
Carrefour offered a letter of credit to ensure payment and, in
August 2009, produced a draft letter of credit application for
the full purchase price of the goods which lists Corporate
Funding Parterns, LLC as the consignee of the bills of lading
also at the same the address in Quebec that Corporate Funding

designated as its consignee address. The letter of credit contained the same shipping compliance certificate condition common to all of the other prior letter of credits. In Pomeroy's case, one difference: when Pomeroy received the final letter of credit on September 4, 2009, just days after the Dependable scam surfaced in late August 2009, both Carrefour and Corporate Funding Partners are switched out and replaced by "Ganges Exports USA" as **both the applicant and the consignee** of the truck bills of lading. Since Pomeroy had never heard of Ganges Exports USA until this late moment, it inquired as to whom this entity was and why it was being inserted into the transaction. Pomeroy was informed that Ganges Export USA was the "export agent" for Corporate Funding Partners, and Pomeroy was instructed that even though this Ganges Exports USA listed a Manhattan, NY address on the letter of credit, it was to nonetheless ship the goods to Corporate Funding Partners' Quebec address that was identified in the draft letter of credit application. Thereafter, the same all too familiar pattern resulted: Pomeroy shipped the computer equipment on September 21, 2009 to Canada, Ashford Finance refused to supply the shipping compliance certificate, no payment of the goods or the goods themselves were forthcoming to Pomeroy, thus completing the scam.

46.

Marshall Jablon is sole owner and operator of Corporate Funding Partners and LC.Com, Ltd. In the fraudulent scheme detailed above, Mr. Jablon used Corporate Funding Partners, Corporate Funding Partners, LLC, LC.Com, Ltd interchangeably. In addition, Mr. Jablon used a fictitious entity, Ganges, as a substitute for the aforementioned companies when the scheme first surfaced upon Dependable in August 2009.  In addition, Corporate Funding Partners has no assets, no employees and observes no corporate formalities, such as director or member meetings or any memorialization of such essential corporate activities.

47.

In this scheme and with the transaction involving Quastar, Marshall Jablon used these various corporate entities, including Corporate Funding, LC.com, Ltd and Ganges interchangeably and with the intent to defraud, disregarding corporate entities and formalities in an attempt to confuse Quastar and the aforementioned sellers in the scheme. These entities acted as the consignee of the truck bills of lading for all of these shipments, including Quastar, and as such, controlled the shipment of the goods stolen by false pretenses and received the shipment once it was delivered to Canada.  All aforementioned entities were solely owned and controlled by Marshall Jablon and

to uphold any corporate or entity integrity of these companies
would allow an unjust fraud to be perpetrated upon Quastar.  As
such, any corporate veils should be pierced under the facts of
this case and personal liability should be assessed upon
Defendant Jablon.


### Fraud Against All Defendants

48.

Quastar incorporates by reference the allegations set forth
in Paragraphs 1-47 as if fully set forth *verbatim*, herein.

49.

The Defendants enticed Quastar to ship $215,978 worth of
computer equipment through fraudulent misrepresentations
concerning the Letter of Credit and the conditions that would
cause the funding of the Letter of Credit to Quastar.

50.

The Defendants fraudulently inserted Ganges as a third
party into the transaction, using misrepresentations about the
funding conditions of the Letter of Credit.

51.

The Defendants collaborated together to induce Quastar to rely on the Letter of Credit to ship computer equipment to Carrefour, never intending for the Letter of Credit to be paid, knowing it would be dishonored and causing the dishonor. Furthermore, Quastar would have never shipped the computer equipment to Carrefour unless it would have received the funds through the Letter of Credit.

52.

Defendant Corporate Funding is vicariously liable for any the acts, including fraudulent misrepresentations, of Ganges because Ganges is a business alter ego and/or a dba of Corporate Funding.

53.

Specifically, the fraudulent misrepresentations by each defendant and the specific paragraph in the Complaint that details the misrepresentations of each Defendant:

(a)   Carrefour: ¶¶ 17, 24, 26 and 28;

(b)   Ashford Finance: ¶¶ 18, 25 and 27;

(c)   Corporate Funding: ¶¶ 17, 20, 24 and 28;

(d)   Nosh Hasan: ¶¶ 18, 25 and 27;

(e)   Mike Tones: ¶¶ 17, 24, 26 and 28;

(g)   Amin Haq: ¶¶ 28 and 29;

(h)   Beem Khemaney: ¶ 33

**Georgia RICO Against All Defendants**

54.

Quastar incorporates by reference the allegations set forth in Paragraphs 1-48, 52 as if fully set forth *verbatim*, herein.

55.

On at least two separate occasions, as presented in the instant case and shown in the fraudulent misrepresentations above and in the Dependable Case, Defendants have conspired in an enterprise and conducted a pattern of racketeering activity to obtain the property of others through deceitful means and artful practice with the intention of depriving those parties of such property in violation of O.C.G.A. § 16-8-3.

56.

Defendants have engaged in an enterprise to acquire personal property (money) through a pattern and practice of racketeering activity in violation of O.C.G.A. § 16-14-4.

57.

Through Defendants' misrepresentations to Quastar by telephone and emial detailed in this Complaint, Defendants have committed criminal acts of wire fraud pursuant to 18 U.S.C.§ 1343 by obtaining Quastar's property by means of fraud, fraudulent pretenses, promises and representations across interstate communication lines.

58.

Through Defendants' misrepresentations to Quastar by telephone and email detailed in this Complaint and causing or inducing the transportation of stolen computer equipment to be transported across state lines into Canada, Defendants have committed criminal acts of transportation of stolen goods pursuant to 18 U.S.C. § 2314.

59.

Through Defendants' misrepresentations to Quastar by telephone and email detailed in this Complaint to obtain control and custody of the assets controlled by First American Bank of Illinois, namely the letter of credit at issue in this case, by means of fraud or fraudulent promises, Defendants have committed criminal acts of bank fraud pursuant to 18 U.S.C. § 1344.

60.

Quastar has been injured as a result of Defendant's actions and is entitled to recover money damages from him pursuant to O.C.G.A. § 16-14-6(c).

**Unjust Enrichment Against Defendants Ashford Finance, Carrefour, Corporate Funding and Ganges**

61.

Quastar incorporates by reference the allegations set forth in Paragraphs 1-43, 48 as if fully set forth *verbatim*, herein.

62.

Defendants Ashford Finance, Carrefour, Corporate Funding and Ganges falsely procured the computer equipment and/or monetary benefits from Quastar and the transaction without

- 33 -

paying Quastar for such computer equipment or returning said equipment.

63.

Defendants Ashford Finance, Carrefour, Corporate Funding and Ganges have been unjustly enriched.

**Breach of Contract the Sale of Goods Against Defendants Carrefour, Corporate Funding and Ganges**

64.

Quastar incorporates by reference the allegations set forth in Paragraphs 1-47, 52 as if fully set forth *verbatim*, herein.

65.

Quastar and the Defendants Carrefour, Corporate Funding and Ganges entered into a contract for the sale of goods. In conformity therewith, Quastar shipped computer equipment to Carrefour and Corporate Funding Partners.

66.

The Letter of Credit that listed Quastar as beneficiary was dishonored and Quastar was not paid for the equipment nor was the equipment returned to Quastar.  As a result, Carrefour,

Corporate Funding and Ganges are liable for the agreed upon price of the computer equipment.

**Punitive Damages**

67.

Quastar incorporates by reference the allegations set forth in Paragraphs 1-47, 52 as if fully set forth *verbatim*, herein.

68.

The actions of the Defendants, as set forth above, show willful misconduct, wantonness and that entire want of care which raises the presumption of a conscious indifference to the consequences of his actions.   Accordingly, Quastar seeks punitive damages pursuant to O.C.G.A. § 51-12-5.1.

**Treble Damages, Attorney's Fees and Expenses of Litigation**

69.

Quastar incorporates by reference the allegations set forth in Paragraphs 1-47, 52 as if fully set forth *verbatim*, herein.

70.

The actions of the Defendants, as set forth above, show a violation of O.C.G.A. § 16-14-1, *et seq*., the "Georgia RICO Act."  Accordingly, Quastar seeks recovery of three times its

actual damages, its attorney's fees, *and* costs of investigation and litigation pursuant to O.C.G.A. § 16-14-6(c).

**WHEREFORE**, Plaintiff demands:

A.   That Civil Process issue as provided by law;

B.   That it be awarded compensatory damages as provided by law;

C.   That it be awarded expenses of litigation, attorney's fees, treble damages, *and* punitive damages as provided by law;

D.   A Trial by Jury;

E.   That it have such other additional relief as the Court may consider equitable and/or appropriate given the circumstances of this case.

CERTIFICATION OF FONT TYPE AND SIZE

Undersigned counsel hereby certifies that Plaintiff's
SECOND AMENDED COMPLAINT has been prepared with Courier New 12-
Point Font, as approved in LR 5.1.


Respectfully submitted this 7th day of September, 2012.

GEORGIA BUSINESS LAW GROUP, LLC

/Bentley Greg Cline

_____
B. Greg Cline

Georgia State Bar No. 170410
Telephone: (770) 670-6203
Facsimile: (770) 670-6213
bgcline@gabusinesslawgroup.com
2 Ravinia Drive
Suite 650
Atlanta, GA 30346
Attorney for Plaintiff The DeLoach Group, Inc. d/b/a
Quastar Computer International